IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Canchu Lin,                                    Case No. 3:11 CV 0004

                    Plaintiff,                 MEMORANDUM OPINION
                                               AND ORDER

          -vs-

                                               JUDGE JACK ZOUHARY
Bowling Green State University,

                    Defendant.


### INTRODUCTION

        This case arises from the denial of Plaintiff Canchu Lin's application for tenure and promotion

to an associate professorship with Defendant Bowling Green State University ("University").  Plaintiff

brings this action pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, alleging

the University denied his tenure application because of his race and national origin, and retaliated for

his filing an internal complaint of discrimination.  Plaintiff also alleges the University subjected him

to a hostile work environment and other forms of discrimination based on race, national origin, and

because he complained of discrimination.

        The University moved for summary judgment, arguing Plaintiff failed to produce sufficient

evidence to permit a reasonable jury to conclude that his race, national origin, or his complaints of

discrimination, were factors in the decision to deny his tenure application (Docs. 36 & 37).  The

University also contends Plaintiff produced insufficient evidence to show he was subject to a hostile

work environment.  The matter has been fully briefed (Docs. 48, 50 & 56).

Pursuant to Local Rule 72.2(b)(2), this case was referred to Magistrate Judge Armstrong, whose Report and Recommendation ("R&R") recommends this Court grant the University's Motion (Doc. 56). Plaintiff timely objected (Doc. 57), and this Court now conducts a *de novo* review of the portions of the R&R to which objections were filed. *See* 28 U.S.C. § 636(b)(1)(B) & (C); *Hill v. Duriron Co.*, 656 F.2d 1208, 1214 (6th Cir. 1981).

### BACKGROUND

#### Plaintiff's Employment History at the University

Plaintiff was employed by the University, a state university in Ohio, from 2003 until 2011. Plaintiff was initially hired as an instructor in the Department of Communication, one of the three departments in the School of Media and Communication, which is part of the College of Arts and Sciences (Doc. 23 at 2–3). Beginning his second year, and upon completion of his PhD degree, Plaintiff was promoted to assistant professor, a tenure-track position. The University reappointed Plaintiff as an assistant professor each year leading up to 2009, the year he was considered for tenure and promotion to associate professor (Doc. 23 at 3).

The procedures for annual evaluations and tenure promotions are set forth in the University's charter, the College's guidelines and the Department's policies (Doc. 23 at 7). In short, faculty members in Plaintiff's Department are expected to devote 40% of their work to teaching, 40% to research, and the remaining 20% to service. Annual evaluations focus on those areas and in those proportions. According to Plaintiff, his teaching performance "compared favorably with faculty standards" (Doc. 48 at 8). While some of Plaintiff's evaluations note improvement in his teaching skills, the dean of Plaintiff's College continuously pointed to issues and concerns regarding Plaintiff's overall teaching performance, his failure to encourage active learning in the classroom, and his

2

shortcomings in face-to-face teaching.  These persistent concerns are evidenced by the dean's evaluations of Plaintiff from 2005 to 2009, as well as by evaluations from other University administrators (Docs. 24 at 8–10, 22–25, 39 & 41; 25 at 20).

### The Undergraduate Program Coordinator Position

In response to an August 2009 faculty e-mail from School Associate Director Michael Butterworth regarding committee vacancies, Plaintiff expressed an interest in serving as the undergraduate program coordinator on the Undergraduate Program Committee.  While the coordinator position does not offer additional pay, the faculty member in that role receives additional responsibilities, such as reviewing curriculum, handling student complaints, and serving as the "go-to" person for undergraduate issues in the Department (Doc. 23 at 20–21).

Shortly after responding to the e-mail, acting Department Chair Lynda Dixon approached Plaintiff regarding the coordinator position and took him to see Director Terry Rentner.  According to Plaintiff, Dixon and Rentner "attacked" him for offering to take the position.  Dixon expressed concern that Plaintiff was not qualified for the position given his "poor record in student advising" and the fact that "he did not know American culture."  Dixon suggested Plaintiff instead take a position in the Currier Speaker Committee, as that position was easier (Doc. 48 at 7).  Plaintiff recalls Rentner agreed with everything Dixon said, "nodding her head up and down" (Doc. 48 at 8).

The University describes the meeting as professional, with no raised voices, and asserts that Dixon informed Plaintiff that the coordinator position was not "a good fit" because it was time-consuming -- which Dixon advises against for faculty members in their tenure review year -- and because Plaintiff had difficulties advising and interacting with undergraduate students (Doc. 37 at 13).

3

At the School faculty meeting, Dixon nominated Plaintiff for the Currier Speaker Committee, and he was selected (Doc. 23 at 24–25) .

### Plaintiff's Tenure Application

In 2009, in preparation for his application for tenure and promotion, Plaintiff received a packet of information about the tenure review process. Part of this process involves the evaluation of the candidate's research record by external reviewers, who are nationally recognized scholars with expertise in the candidate's field. External reviewers are selected through a collaborative process, with suggestions made by the candidate, as well as the Department's tenured faculty and chair (Doc. 31 at 19). Materials provided at mandatory workshops explain, and Associate Dean Goza emphasizes at those workshops, that "all communications with external reviewers are to be from the department chair, not the candidate" (Doc. 37 at 14).

Nevertheless, Plaintiff wrote brief e-mails to several distinguished professors, asking if they would consider serving as reviewers. Upon receiving positive replies, he e-mailed the list of potential reviewers to Dr. Lara Lengel, the Department Chair (Doc. 23 at 8). The University concluded that Plaintiff's contact with the reviewers was a clear breach of standard procedure. For that reason, Associate Dean Goza, Director Rentner, and Dean Simon Morgan-Russell, disqualified anyone Plaintiff contacted directly and, a new group of reviewers was selected instead (Doc. 37 at 15). Plaintiff argues that the University did not clarify that candidates could not contact potential external reviewers, and that all candidates on his list were disqualified even though he did not contact all of them (Doc. 48 at 9–10).

In the fall of 2009, Plaintiff submitted his application to be considered for tenure and promotion to associate professor. Tenure candidates are required to assemble an extensive portfolio

4

containing certain documents, including evaluations, the external review letters, student evaluations, and other materials regarding the candidate's teaching, research, and service.  The portfolios are reviewed, in turn, by the Department Faculty Tenure Committee, the Department Chair (Lengel), the School Director (Rentner), the College Promotion and Tenure Committee, the College Dean (Morgan-Russell), and the University Provost (Kenneth Borland).

The Department Faculty Tenure Committee met in September 2009 to consider Plaintiff's application, as well as that of a second candidate, Sandra Faulkner (Doc. 23 at 36).  The members of the committee were Alberto Gonzales, Radhhika Gajjalla, Dixon, and Lengel.  According to Plaintiff, the committee's discussion regarding his candidacy deviated from the standard course because Dixon attempted to address matters outside his portfolio, as well as raise questions never asked during the discussion of Faulkner's portfolio.  Gonzales pointed out that some of Dixon's questions could have been raised about Faulkner, and asked Dixon why she did not raise those same questions before (Doc. 48 at 11).

The Department Committee ultimately voted unanimously to recommend Plaintiff for tenure and promotion; however, Chair Lengel's recommendation was equivocal, and Director Rentner recommended against tenure and promotion.  The College Promotion and Tenure Committee orally recommended to Dean Morgan-Russell, and Morgan-Russell recommended to Provost Borland, that Plaintiff not be granted tenure and promotion.  Based on his independent review of Plaintiff's portfolio, Provost Borland determined not to forward Plaintiff's portfolio for promotion and tenure to the University's Board of Trustees (Doc. 26 at 4 & 9–10; Doc. 37 at 10).

Shortly after the Department Faculty Tenure Committee voted in favor of Plaintiff's application, Dixon and Lengel told Director Rentner they had reservations about the faculty

recommendation and had felt pressured to vote for Plaintiff's tenure due to concerns about Department collegiality.   Dixon and Rentner asked if there could be a re-vote, but the dean's office confirmed that no re-vote would occur (Doc. 29 at 23–24).   Plaintiff argues this attempted re-vote was an "irregularity" in his review process, pointing out that faculty member Gonzales, who has worked in the provost office in the past, was unaware of any other occasion in which a committee member requested a re-vote (Doc. 48 at 12).

As Department Chair, Lengel was required to write a separate letter with a recommendation regarding Plaintiff's tenure application.   Lengel struggled with her letter, though Plaintiff argues Lengel did not indicate discomfort with her favorable recommendation during the Department Committee meeting (Doc. 48 at 13).   Lengel submitted one letter, then revised its ending when Rentner told her it needed to include a specific recommendation on tenure and promotion.   Lengel's initial letter ended with: "The tenured faculty and I approve his application for promotion and tenure. However, the approval is neither unqualified nor strong." (Doc. 30 at 61).   The final letter substituted those sentences with:  "Upon careful reflection and after completing this evaluation as department chair, I am not comfortable putting forth a positive recommendation for promotion to associate professor with tenure." (Doc. 30 at 69).   Plaintiff alleges that Rentner "pressured" Lengel into changing her letter to be less favorable to his application.   Nonetheless, Lengel signed Plaintiff's portfolio with a recommendation for tenure and promotion (Doc. 30 at 144).

In early January 2010, Plaintiff had a conversation with Morgan-Russell regarding the denial of his application for tenure and promotion.   According to Plaintiff, Morgan-Russell explained that the real reason behind his decision against Plaintiff's tenure was the fact he did not speak English as a native speaker (Doc. 23 at 28).   Morgan-Russell denies making such comment.

6

**Plaintiff's Complaints of Discrimination**

In December 2009, after receiving Rentner's recommendation against tenure and promotion, Plaintiff filed a complaint with the University's Office of Equity and Diversity.  Plaintiff alleged Rentner and Dixon discriminated against him on the basis of race and national origin, and retaliated against him because he engaged in protected activity.  After a lengthy investigation, Office Director Marshall Rose concluded there was no evidence to corroborate Plaintiff's allegations (Doc. 25 at 41–65).  Provost Borland reviewed the investigation reports, accepted their findings and denied Plaintiff's allegations (Doc. 25 at 66–69).  Plaintiff appealed to the University President, who upheld the Provost's decision  (Doc. 25 at 70).

In April 2010, Plaintiff filed a grievance with the University over his tenure denial, claiming that Rentner and Morgan-Russell were unfair, partial, inconsistent, failed to abide by policies, and inadequately and inequitably considered his professional competence.  Plaintiff received a hearing before the University's Faculty Personnel Conciliation Committee and other appointed faculty.  The committee ultimately concluded that Plaintiff did not fulfill the burden of proof necessary to overturn the University's decision on his tenure and promotion.  Plaintiff appealed, but the University President affirmed the denial of Plaintiff's grievance (Doc. 25 at 73–97).

In June 2010, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging his application for tenure and promotion was denied based on his race, national origin, and in retaliation for filing an internal complaint.  The EEOC dismissed the charge in October 2010 (Doc. 25 at 72), and Plaintiff timely filed this action.

7

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

## DISCUSSION

While the R&R focuses on Section 1981, Plaintiff's claims of national origin and race discrimination, as well as his claims for retaliation, are brought under both Section 1981 and Title VII. However, for purposes of this case, the standards under both statutes are the same.  The Magistrate therefore properly analyzed all claims under a single, uniform standard, and this Court will do the same. *See Bobo v. United Parcel Servs., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012) (holding claims for discrimination and retaliation under Section 1981 and Title VII are reviewed under the same standard); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009).

Plaintiff raises seven specific objections to the R&R, and this Court addresses each, in turn.

**Objection No. 1:  Direct Evidence**

Plaintiff first objects to the Magistrate's conclusion that there is no direct evidence of race or national origin discrimination (Doc. 57 at 1–2).  As the R&R notes, Plaintiff may prove intentional discrimination by introducing direct evidence of discrimination, or by proving inferential and circumstantial evidence supporting an inference of discrimination.  *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  In proving his claims through direct evidence, Plaintiff need not proceed under the *McDonnell Douglas* burden-shifting framework, which applies only when discrimination is proven through circumstantial evidence.  *Id.* at 415; *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991).  Rather, Plaintiff must offer evidence "which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *DiCarlo*, 358 F.3d at 415 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  In other words, Plaintiff's direct evidence must not require a fact-finder to draw inferences in concluding "that the challenged employment action was motivated at least in part by prejudice against members of the protected group."  *Id.* (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003)).

Moreover, direct evidence must establish not only that the University "was predisposed to discriminate on the basis of [race and national origin], but also that [it] acted on that predisposition." *Id.* (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000)).  Once direct evidence of improper motive is presented, Plaintiff "does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action."  *Id.*  "Rather, the burden shifts to the [University] to prove by a preponderance of the evidence that it would have made the same decision absent the

9

impermissible motive." *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)).

Plaintiff argues he presented direct evidence of discrimination in two ways. First, Dixon told Plaintiff during an August 2009 meeting that he should not offer to take the undergraduate coordinator position because he was unfamiliar with American culture (Doc. 48 at 17–18). Defendant admits that Dixon said something to that effect, but contends that her comment was not based on Plaintiff's race or national origin, but was instead premised on his "difficulties connecting with undergraduate students, as noted in various administrator, peer and student evaluations" (Doc. 37 at 16). Second, Morgan-Russell told Plaintiff in January 2010 that the real reason for his recommendation against Plaintiff's promotion was that Plaintiff did not speak English as a native speaker (Doc. 48 at 18–19). Morgan-Russell denies making such statement, and provides evidence of his past recommendations for promotion of a number of non-native English speakers (Doc. 37 at 17).

Although a question of fact exists regarding Morgan-Russell's alleged comment to Plaintiff, it is not a material one. Drawing all inferences in a light most favorable to Plaintiff, neither Dixon's nor Morgan-Russell's comments constitute direct evidence of discrimination. This is so because it is undisputed that Provost Borland -- not Dixon or Morgan-Russell -- made the ultimate recommendation regarding Plaintiff's tenure application to the University's Board of Trustees. Indeed, his independent decision was based on his own review of Plaintiff's *entire* portfolio, not just the recommendations (Doc. 26 at 4). Plaintiff has presented no evidence that Provost Borland made any statements or comments evidencing discriminatory intent or demonstrating the University's predisposition to discriminate against Plaintiff. *See DiCarlo*, 358 F.3d at 415.

Even so, Plaintiff insists direct evidence exists because Provost Borland could not possibly ignore recommendations from other professors, including the "tainted" recommendations from Dixon and Morgan-Russell (Doc. 48 at 19).  Plaintiff's argument, however, is supported by mere speculation. Moreover, even assuming that Dixon's and Morgan-Russell's letters were based on Plaintiff's race or national origin, finding that Provost Borland based his decision on discriminatory animus requires inferring that he knew, agreed with, and acted on Dixon's and Morgan-Russell's reasoning.  Because these inferences are required, Plaintiff has not satisfied his burden under a direct evidence framework. *DiCarlo*, 358 F.3d at 415; *see also Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (holding plaintiff did not establish direct evidence of discrimination because an inference was required in finding that supervisor based his employment decision on subordinate's racially-charged recommendation).

### Objection No. 2:  Property Interests in Section 1981

Both parties object to the Magistrate's discussion regarding property interests in Section 1981 cases as inapplicable to this case (Docs. 57 at 2 & 58 at 2).  This Court agrees.

### Objections No. 3 & 6:  Circumstantial Evidence

Plaintiff next objects to the Magistrate's conclusion that he cannot establish a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework (Doc. 57 at 3).  Plaintiff also objects to the Magistrate's finding that there were legitimate concerns regarding Plaintiff's job performance (Doc. 57 at 5).  Because both objections relate to the *McDonnell Douglas* inquiry, this Court considers them together.

11

### *Plaintiff Fails to Set Forth a Prima Facie Case*

Under the indirect evidence framework, Plaintiff bears the initial burden of establishing a prima facie case of discrimination, at which point a presumption arises that the University unlawfully discriminated against Plaintiff.  *See Grizzell*, 461 F.3d at 719; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  The burden then shifts to the University to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action.  *Grizzell*, 461 F.3d at 719; *DiCarlo*, 358 F.3d at 414.  If the University succeeds in this task, the burden shifts back to Plaintiff to demonstrate Defendant's proffered reason was not its true reason, but merely pretext for unlawful discrimination.  *Grizzell*, 461 F.3d at 719; *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994) ("[O]nce the employer has come forward with a nondiscriminatory reason for [its actions] the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.").

To establish a prima facie case of discrimination, Plaintiff must show he: (1) is a member of a protected class; (2) applied and was qualified for promotion; (3) was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions.  *Grizzell*, 461 F.3d at 719 (citing *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).  The parties do not dispute the first and third elements -- that Plaintiff is within a protected class and was considered and denied tenure and a promotion to an associate professorship.  For purposes of Defendant's Motion, this Court also assumes that Plaintiff satisfies the second element -- that he was qualified for tenure and promotion.  Plaintiff, however, cannot meet his burden with respect to the fourth element.

The fourth element requires Plaintiff "to show that a similarly-situated individual outside his protected class was promoted." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009).  In determining whether an individual is similarly-situated, this Court must make "an independent determination as to the relevance of a particular aspect of [P]laintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  While Plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment," he must show he is similar to that employee in "all of the relevant aspects." *Id.* at 352 (quoting *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, (6th Cir. 1994)) (emphasis omitted).

Plaintiff alleges he is similarly situated to Kathy Bradshaw, arguing he could have shown he was more qualified for tenure and promotion than Bradshaw had he been allowed discovery on that issue (Doc. 48 at 19–20).  Plaintiff's argument, however, fails for numerous reasons.  First, Bradshaw was awarded tenure in a different department at the University in 2006 -- nearly four years before Plaintiff's tenure application was denied.  Bradshaw is thus too far removed in time from Plaintiff to be considered similarly-situated.  Given that Bradshaw and Plaintiff are members of different departments, Bradshaw's application was also considered under a different tenure and promotion policy from that governing Plaintiff.  Indeed, Rentner was unable to compare Plaintiff with Bradshaw due to departmental differences (Doc. 29 at 28).

Moreover, a different University provost was the decision-maker on Bradshaw's tenure application, and recommendations as to her promotion were made by different department faculty members, including a different college dean.  While Morgan-Russell was Associate Dean when Bradshaw was considered for tenure, the associate dean's role in the tenure process is limited, and

13

Morgan-Russell confirmed he had no actual role in Bradshaw's tenure recommendation (Docs. 28 at 4 & 27 at 81). Considering all relevant aspects, Plaintiff and Bradshaw are not similarly-situated. As the Magistrate correctly noted, each dealt with different supervisors, were subject to different standards, and applied for tenure and promotion at different times through different departments. There are too many differences between Bradshaw's successful tenure application and Plaintiff's unsuccessful one to support a prima facie case of discrimination.

Plaintiff contends he has established other evidence, even in the absence of a similarly-situated individual, that demonstrates race and national origin discrimination played a role in the University's denial of his tenure application (Doc. 48 at 20). Specifically, Plaintiff argues that his tenure review process was tainted by "procedural irregularities," citing for support *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2d Cir. 1984). In *Zahorik*, the Second Circuit recognized that certain "[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the [tenure review] process." *Id.* at 93. However, the *Zahorik* court warned that such was only the case where the alleged "departure[s] may reasonably affect the decision." *Id.* Plaintiff points to three specific instances in this case as evidence of departures from regularity (Doc. 48 at 21–22). A careful review of the record, however, does not support Plaintiff's position because the alleged irregularities could not have reasonably affected the University's decision to deny Plaintiff's tenure and promotion.

Plaintiff first points to a discussion that took place at the lowest tenure review level, when Dixon attempted to raise matters and questions outside Plaintiff's portfolio. Regardless of this discussion, the Tenure Committee unanimously voted to recommend Plaintiff for tenure and promotion, and the recommendation report was drafted by Gonzales, not Dixon. Only Gonzales'

14

report was included in Plaintiff's portfolio as it moved up the levels of review, and there is no evidence the report included Dixon's comments.  In short, nothing supports the conclusion that Dixon's statements affected the University's decision to deny tenure.

Secondly, Plaintiff challenges Dixon's request for a re-vote after the Tenure Committee recommended Plaintiff for promotion.  However, no re-vote was actually permitted; thus, Dixon's request could not have affected the University's decision.  In any event, there is no evidence Dixon sought to re-vote for a discriminatory reason, only that she regretted her earlier positive vote.

Lastly, Plaintiff attacks Department Chair Lengel's differing statements over her vote and recommendation on Plaintiff's tenure application.  In both the original and final versions of her October 2009 chair recommendation letter, Lengel wrote the following regarding the Department faculty vote (Doc. 30 at 60 & 68):

> Two of the members were in favor of the promotion and tenure decision with some minor reservations; however, two had several issues that gave them pause in approving [Plaintiff] for this advancement.  While we worked for consensus without acrimony, two of the faculty continue to have reservations that made them uncomfortable to make the vote a tie.  The two faculty members eventually made the vote unanimous.  It is not that the two nay voters were pressured by the other two to vote "yes," but they were uncomfortable because of the climate that voting "no" would create undue conflict within the Department.

Faced with her own vote in Plaintiff's favor, Lengel submitted the first version of the Department Chair recommendation to Rentner in October 2009, which concluded (Doc. 30 at 61):

> As mentioned above, I concur with external reviewer, Dr. Eric Kramer, who states, "My assessment is that this is a borderline case for tenure and promotion."  While I cannot speak for the other three tenured faculty members, perhaps we all voted in the way that we have in the effort to be fair that [Plaintiff] met the expectations set fort by Chair Dr. Julie Burke in this Third Year Review.  In my review of those expectations, I argue they are low and do not reflect the teaching, research and service excellence of our departmental colleagues, both tenured and probationary.  No faculty like to deny a colleague for tenure, but issues and problems with his records, particularly his undergraduate face-to-face teaching, make this a difficult choice.  The tenured faculty

15

and I approve his application for promotion and tenure. However, the approval is neither unqualified nor strong.

Rentner asked Lengel to change the end of her recommendation because it did not provide the chair's specific recommendation, which Rentner understood to be a requirement. Although Plaintiff argues Rentner "pressured" Lengel into writing a negative recommendation, the record evidence shows that Rentner did not tell Lengel to write anything specific or what to conclude in the letter. Instead, Rentner instructed Lengel to make clear whether the conclusion was a recommendation or non-recommendation (Doc. 31 at 11–12).

After amending the letter, Lengel submitted the second version, which was identical to the first except that it substituted the last two sentences for the following (Doc. 30 at 69):

Upon careful reflection and after completing this evaluation as department chair, I am not comfortable putting forth a positive recommendation for promotion to associate professor with tenure.

Despite the differences between the two letters, Lengel signed Plaintiff's portfolio as recommending tenure, and the summary sheet from which Provost Borland was working showed Lengel's recommendation being in favor of tenure (Doc. 30 at 144). Therefore, the letters could not have reasonably affected Provost Borland's ultimate decision to recommend against Plaintiff's promotion. Plaintiff has thus failed to present sufficient evidence of "circumstances permitting an inference of discrimination." *Zahorik*, 729 F.2d at 93–94.

### The University Had A Legitimate, Non-discriminatory Justification

Even if Plaintiff satisfied his prima facie case, his discrimination claims would still fail. The University produced ample evidence supporting a legitimate, non-discriminatory reason for denying Plaintiff's tenure application -- namely, unsatisfactory job performance. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1116 (6th Cir. 2001); *Imwalle v. Reliance Medical Products,*

*Inc.*, 515 F.3d 531, 546 (6th Cir. 2003).  Provost Borland testified that Plaintiff's portfolio showed a continuous deficiency in the area of teaching undergraduate students, and that his performance had not improved to a desirable level.  While the Provost concluded Plaintiff met the University's expectations for research and service "in a minimal way," Plaintiff's teaching efforts fell short (Doc. 26 at 14).

Provost Borland's reasons for denying tenure are well-supported by the University's emphasis on teaching, especially at the undergraduate level, and by the record of Plaintiff's persistent shortcomings in face-to-face teaching.  For instance, in his 2005 evaluation, the dean concluded that Plaintiff's undergraduate teaching evaluations were unsatisfactory, with his "scores falling below departmental means in most areas" (Doc. 24 at 8–10).  The evaluation also noted that "colleagues who observed [Plaintiff's] teaching indicated that [he] did little to encourage active learning in [his] classes" (Doc. 24 at 8–9).  In 2006, the dean noted the same inadequacies, specifically expressing concerns about Plaintiff's teaching (Doc. 24 at 10).

Plaintiff fared no better in his 2007 evaluation, where the dean concluded Plaintiff "has not been successful in [teaching] face-to-face undergraduate courses," and reaffirmed that student evaluations remained "well below departmental means."  The evaluation also noted Plaintiff's failure to interact with students and engage them in active participation, as well as Plaintiff's need to increase his rate of publication and expand his teaching strategies to succeed in his face-to-face courses (Doc. 24 at 22).  Although Plaintiff's 2008 evaluation noted some "progress," it emphasized that Plaintiff needed "further improvement" regarding his "effectiveness as an instructor" (Doc. 24 at 25).

In their 2009 evaluations of Plaintiff, Lengel, Rentner and Morgan-Russell, who replaced the previous dean, expressed concerns very similar to those raised by administrators in earlier years.  For

instance, Rentner noted Plaintiff did "little to encourage active learning in the classroom," did not perform well as an academic advisor at the undergraduate level, and needed to "seek additional mentoring to improve his teaching" because it needed to "improve significantly" (Doc. 24 at 39). Morgan-Russell's review also warned Plaintiff that he should continue to "work with mentors to improve [his] teaching performance" as the Department Chair noted "some serious, chronic concerns that must be addressed . . . to present a successful case for promotion and tenure in Fall 2009" (Doc. 24 at 41).

In addition, student evaluations were analyzed by Dale Klopfer, a member of the University's Promotion and Tenure Review Committee. For each of the 24 classes included in Plaintiff's portfolio, Klopfer created a spreadsheet and compared Plaintiff's effectiveness and overall average scores with the effectiveness and scores of everyone in the Department teaching that course. In 16 of the 18 undergraduate courses taught, Plaintiff was rated below the Department average in both effectiveness and overall scores (Doc. 33 at 59–65). This data was shared with Morgan-Russell, who concluded (Doc. 25 at 20):

> Although [Plaintiff] has shown leadership in the area of online curriculum development, I remain very much concerned about the quality of his teaching, particularly in a face-to-face environment. [Plaintiff's] quantitative student evaluations consistently fall below his department's average; those courses in which his quantitative scores are higher than average are typically small-sample, graduate courses. Both Dr. Rentner and Dr. Lengel remain concerned about his teaching performance . . . . [D]espite these attempts at remediation, [Plaintiff] has not seen any consistent improvement in his teaching performance throughout the duration of his employment, particularly . . . in the undergraduate classroom.

University administrators expressed legitimate concerns about Plaintiff's role as an educator. These concerns, having no connection whatsoever to Plaintiff's race or national origin, satisfy the University's burden of proffering evidence of a legitimate, non-discriminatory reason for refusing

18

Plaintiff tenure. *Grizzell*, 461 F.3d at 719. The University's explanation for its decision is "clear and reasonably specific," and is "supported by admissible evidence which would allow the trier of fact rationally to conclude that [its] decision [was] not motivated by discriminatory animus." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 257–58 (1981)). The final burden therefore shifts to Plaintiff to prove the University's stated reasons for its actions are in fact a pretext designed to hide discrimination. *Grizzell*, 461 F.3d at 719; *Manzer*, 29 F.3d at 1083.

Pretext may be established "either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *White*, 533 F.3d at 392–93 (internal quotations omitted). Thus, Plaintiff can demonstrate pretext by showing the University's stated reason (1) had no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain its action. *Id.* However, the University's proffered reason cannot be proven pretextual "unless it is shown *both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *Harris v. Metro. Gov't of Nashville and Davidson County*, 594 F.3d 476, 486 (6th Cir. 2010) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Plaintiff has not provided evidence to satisfy the above standards for showing pretext. Rather, he simply asserts that "his record met the necessary standard for tenure and promotion, and that [the] University's proffered reason is therefore pretextual" (Doc. 48 at 22). The question for this Court, however, is not whether the University's decision regarding Plaintiff's tenure was correct, but whether it was motivated by unlawful discrimination. As the University notes, courts have long expressed a stern reluctance to second-guess the professional judgment of a university's academic decision-

makers. For that reason, for a plaintiff to succeed in a case claiming the denial of tenure because of discrimination:

> [T]he evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candidate's teaching abilities or the academic needs of the department or university. Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race, universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties and reviewing authorities.

*Zahorik*, 729 F.2d at 94.

Having presented no evidence of pretext, the Magistrate correctly concluded that Plaintiff cannot succeed under the *McDonnell Douglas* burden-shifting framework.

**Objection No. 4: Mixed Motive Analysis**

In his fourth objection, Plaintiff argues that the Magistrate ignored that he can establish discrimination under the so-called "mixed-motive" analysis (Doc. 57 at 4).

Discrimination claims are traditionally categorized as "single-motive" claims, *i.e.*, where an illegitimate reason motivated an employment decision, or as "mixed-motive" claims, *i.e.*, where both legitimate and illegitimate reasons motivated the employer's decision. *White*, 533 F.3d at 396. The Sixth Circuit clarified that the *McDonnell Douglas* framework does not apply to the analysis of mixed-motive claims. *Id.* at 400. Instead, to succeed on a mixed-motive claim, Plaintiff must produce sufficient evidence for a jury to conclude that: (1) the University took an adverse employment action against him; and (2) race, color, religion, sex, or national origin was a motivating factor for its action. *Id.* While the burden of producing some evidence in support of a mixed-motive claim is not onerous, this Court must not send the case to a jury if "the record is devoid of evidence that could reasonably be construed to support [Plaintiff's] claims." *Id.*

Even assuming the first element is satisfied, Plaintiff cannot succeed under a mixed-motive theory because there is no evidence, either direct or circumstantial, that "an illegitimate discriminatory animus factored into the [University's] decision to take the adverse employment action." *Id.* at 401. As discussed above in detail, Plaintiff failed to present sufficient evidence that his race or national origin was a motivating factor -- either alone or mixed with a non-discriminatory motive -- in the University's tenure decision. Accordingly, the Magistrate correctly determined a mixed-motive analysis was unnecessary.

### Objection No. 5: The Lengel Letters

Plaintiff next argues that the R&R viewed the evidence in a light most favorable to the University by reciting the final sentence of Lengel's recommendation letter without reciting the final sentences of the nearly identical earlier version (Doc. 57 at 4–5). According to Plaintiff, the earlier version of the letter, which Plaintiff contends is more favorable to his position, should have been discussed by the Magistrate, along with Plaintiff's argument that Rentner pressured Lengel to change her recommendation. This Court has already addressed both versions of the letter, as well as Plaintiff's allegations regarding Rentner, and this objection is not well-taken.

### Objection No. 7: Retaliation

Plaintiff's final objection is to the Magistrate's conclusion that he cannot establish a claim of retaliation based on his complaint of discrimination with the University's Office of Equity and Diversity (Doc. 57 at 5–6). Once again, *McDonnell Douglas* supplies the relevant analytical framework. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563–64 (6th Cir. 2004).

To make a prima facie showing of retaliation, Plaintiff must show: (1) he engaged in protected activity; (2) the University knew of his protected activity; (3) the University took a materially adverse

21

action against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *See Harris*, 594 F.3d at 485; *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). Once this showing is made, the University must articulate a legitimate non-retaliatory reason for its action before the burden shifts back to Plaintiff to show that the proffered reason was merely a pretext for retaliation. *Harris*, 594 F.3d at 485 (citing *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009)). As with his discrimination claims, the burden of persuasion remains with Plaintiff throughout. *Id.*

The University does not dispute that Plaintiff satisfies the first three elements of his prima facie case (Doc. 37 at 22–23). Although this Court seriously doubts Plaintiff can satisfy the fourth element -- the causal connection requirement -- it is assumed, for summary judgment purposes. The burden therefore shifts to the University which, as discussed above, has presented evidence of Plaintiff's unsatisfactory work performance as a legitimate non-retaliatory reason for denying his tenure application. Plaintiff's shortcomings as a teacher are unrelated to his discrimination complaints with either the University's Office of Equity and Diversity or the EEOC, and cannot support his claim of retaliation. The final burden therefore shifted to Plaintiff to prove pretext.

As with his discrimination claims, Plaintiff fails to provide evidence demonstrating the University's stated reasons for its decision are in fact a pretext designed to hide retaliation. Indeed, nothing in the record supports that conclusion. There is simply no indication that the University's proffered reason is false or that retaliation was the real reason for the denial of Plaintiff's tenure. *See Harris*, 594 F.3d at 485.

## CONCLUSION

The record evidence establishes that there are no genuine issues of material fact as to any of Plaintiff's claims.   Accordingly, this Court adopts the Magistrate's conclusions and grants the University's Motion for Summary Judgment.

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

May 31, 2012